OLYMPIC, INC., CBS Real Estate, Inc., and Chicago Insurance Company, Appellants,

v.

PROVIDENCE WASHINGTON INSURANCE COMPANY OF ALASKA, Appellee.

No. 5627.

Supreme Court of Alaska.

Aug. 6, 1982.

Andrew J. Kleinfeld, Fairbanks, for appellants.

Mark A. Sandberg, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

This appeal arises from an action brought by a landlord and its insurer against a tenant's insurer. The landlord's insurer, Chicago Insurance Co. (Chicago), paid $600,-000.00 to settle a wrongful death action against the landlord, Olympic, Inc. (Olympic) and CBS Real Estate, Inc. (CBS). Chicago[1] filed an action in superior court to recover at least part of the $600,000.00 from the tenant's insurer, Providence Wash-

ington Insurance Company of Alaska (Providence). Both sides moved for summary judgment. The superior court granted summary judgment in favor of Providence. Chicago argues on appeal that damages resulting from the tenant's breach of a covenant to procure liability insurance was expressly covered by the tenant's insurance policy with Providence, and alternatively, that the landlord was an "implied insured" under the tenant's policy. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Olympic and CBS are sister corporations owned by Peter Zamarello and his family. Zamarello develops real estate. His projects usually proceed with Olympic buying property, building improvements upon it, and then transferring title to CBS. CBS acts as manager of the real estate it acquires from Olympic.[2]

One of Olympic's construction projects was located at 100 Muldoon Road, Anchorage. In October 1972 Olympic leased this site for use as a grocery store. Alaskan General, Inc. eventually became the tenant and operated the Muldoon Bi-Lo store, part of a larger chain of Bi-Lo retail markets.

The lease required, among other things, that the tenant provide liability insurance for the store premises on behalf of the landlord:

> The Lessee shall provide and maintain public liability insurance in a minimum amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), naming Lessor as a named insured, which insurance will save the Lessor harmless from liability from any injuries or losses which may be sustained by any persons or property while in or about the said premises.

Alaskan General obtained a liability insurance policy from Providence. However, the policy named only Alaskan General, Inc.,

---

1. Olympic and CBS are nominal parties to the action. We refer to the appellants collectively as Chicago.

2. With respect to the actions underlying this litigation, the record does not clearly establish the respective rights and obligations of the two corporations. For purposes of this opinion, we refer to CBS and Olympic, both singularly and collectively, as Olympic.

Retail Division, as the insured. The policy contained a "Named Insured Endorsement" that extended coverage to various other Bi-Lo stores. Olympic was not included in this endorsement either. All parties apparently agree that Alaskan General breached its obligation to procure an insurance policy on which the lessor was a named insured.

On February 6, 1976, fire broke out at the Muldoon Bi-Lo store. A firefighter was killed while attempting to extinguish the blaze. The firefighter's estate commenced a wrongful death action against Olympic and Alaskan General, alleging that negligence in failing to install a sprinkler system and various other building-code nonconformities proximately caused the firefighter's death. Alaskan General was dismissed by stipulation from the action after discovery. Chicago paid the firefighter's estate $600,000.00 to settle the suit on behalf of Olympic. No cross-claim was asserted against Alaskan General in that litigation.[3]

The principal question in the present case is whether Providence must indemnify Chicago for any part of the settlement.[4] We consider, first, whether Chicago derives a right to indemnification from the express provisions of the Providence-Alaskan General policy, and second, whether recovery is available under the "implied insured" doctrine.

## II. EXPRESS POLICY COVERAGE

Providence's insurance policy provided Alaskan General with two major types of coverage: comprehensive general liability insurance and contractual liability insurance. The policy included a "Waiver of Subrogation" provision. Under the general liability insurance policy, Providence promised to:

> pay on behalf of the insured [Alaskan General] all sums which the insured shall become legally obligated to pay as damages because of
> A. bodily injury or

> B. property damage
> to which this insurance applies, caused by an occurrence . . . .

Immediately following this general insuring provision there is a section that the parties refer to as the "contractual liability exclusion":

> This insurance does not apply:
> (a) to liability assumed by the insured under any contract or agreement except an incidental contract; . . .

The policy defines "incidental contract" as, among other things, "any written . . . lease of premises . . . ." If Alaskan General had fulfilled the lease agreement to provide $300,000.00 in insurance for Olympic, Chicago would have been saved $300,000.00 of the wrongful death settlement. Thus, Chicago claims $300,000.00 damages for breach of contract and asserts that this $300,000.00 constitutes "sums", within the meaning of the policy, "which the insured [became] legally obligated to pay as damages because of . . . bodily injury" to the firefighter. Chicago concludes that it is entitled to $300,000.00 in compensation from Providence under the general liability policy.

In arguing that the general liability policy covers the lease covenant to buy insurance, Chicago first relies upon the policy's contractual liability exclusion. Chicago asserts that this exclusion of "liability assumed by the insured under any contract . . . except an incidental contract" implies that the policy insures against liability under any contract defined as "incidental." Because the lease covenant is an incidental contract, Chicago claims that Alaskan General's breach gave rise to liability covered by the policy.

In order to be covered under the general liability policy, a contract must not only be "incidental" within the meaning of the policy, but it must also be a contract in which liability is assumed. The chief difficulty with Chicago's argument lies in its premise that the lease was a form of "contractual

---

3. *Whitehorn v. Olympic, Inc. and CBS Real Estate, Inc.*, No. 3AN–76–6787 Civ. (Alaska Super., 3d Dist., Anchorage, 1976).

4. A related action against Alaskan General has not been pursued due to the pendency of bankruptcy proceedings.

liability" or "liability assumed by contract." "Liability assumed by the insured under any contract" refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract. *Continental Insurance Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972); *Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co.*, 548 F.2d 681, 684 (7th Cir. 1977); *J. L. Simmons Co., Inc. v. Fidelity and Casualty Co.*, 511 F.2d 87, 96 (7th Cir. 1975); *Haugan v. Home Indemnity Co.*, 86 S.D. 406, 197 N.W.2d 18, 23 (1972).[5] *See* 1 R. Long, Law of Liability Insurance § 1.12 (1981); 2 R. Long, *supra* §§ 10.17, 10.19.

▪ Thus, Chicago overlooks the important distinction between *incurring* liability through breach of contract and specifically contracting to *assume* liability for another's negligence. *See CM, Inc. v. Canadian Indemnity Co.*, 635 F.2d 703, 708 (8th Cir. 1980). Liability ordinarily occurs only after breach of contract. However, in the case of indemnification or hold harmless agreements, assumption of another's liability constitutes performance of the contract. Because "liability assumed by contract" refers to a particular type of contract—a hold harmless or indemnification agreement— and not to the liability that results from breach of contract, the contractual liability exclusion applies only to hold harmless agreements.[6] 1 R. Long, *supra* § 1.12, at 1–26.

▪ Alaskan General's agreement to purchase insurance does not constitute a hold harmless contract. Long defines hold harmless agreements as "contract[s] by

which one party (the indemnitor) assumes the liability to pay damages imposed by law upon the other party (the indemnitee)." 2 R. Long, *supra* § 10.17A, at 10–28. Unless it clearly and unequivocally expresses the intention to shift liability, an agreement will not be construed as holding a party harmless from the consequences of his or her own negligence. *Id.*, at 10–28, 10–28.1, *citing Thompson-Starrett Co. v. Otis Elevator Co.*, 271 N.Y. 36, 2 N.E.2d 35, 37 (1936) *and Waterway Terminal Co. v. P. S. Lord Contractors*, 242 Or. 1, 406 P.2d 556, 564 (1964).

▪ In the lease in question, the parties simply agreed that Alaskan General would purchase insurance which named the lessors as a named insured. On its face, the lease covenant evinces only one clear and unequivocal intention—to transfer the cost of liability insurance to the tenant. If Olympic had intended that the tenant pay personal injury claims against Olympic, then the lease should have so specified, instead of merely requiring the tenant to purchase insurance. There is a critical difference between the two obligations, and we have explained and relied upon this difference in past cases. For example, in *Continental Insurance Co. v. Bussell*, 498 P.2d 706, we held that an employer's promise to purchase life insurance on behalf of employees did not render him an insurer directly obligated in case of an employee's death. We distinguished in *Bussell* between promising to pay for insurance and agreeing to insure:

> When Bussell covenanted to procure a life insurance policy for the benefit of his employees he undertook a duty which

---

**5.** Contractual assumption of liability means "an express contractual assumption of another's potential liability by an agreement to indemnify or hold another harmless for an obligation not otherwise imposed by law." *Haugan v. Home Indem. Co.*, 86 S.D. 406, 197 N.W.2d 18, 23 (1972).

**6.** A general liability policy insures only against "liability which the law imposes upon all insureds alike." 1 R. Long, *supra* § 1.11, at 1–26. The contractual liability exclusion functions to relieve the insurer of responsibility for any "extra" liability that the insured undertakes by

contract beyond the liability imposed by law for negligence:

> Public liability forms and owners and contractors liability forms of insurance generally exclude liability assumed by the insured under any contract or agreement, except incidental contracts defined in the policy. Hence, liability assumed by the insured under a hold harmless agreement is outside the scope of the coverage and must be insured specifically.

2 R. Long, *supra* § 10.19, at 10–28.4, *quoted in Continental Ins. Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972).

could be discharged only by the purchase of such a policy. The union had the right prior to Young's death to insist upon specific performance by Bussell of the obligation to procure the policy rather than await the eventual result of a damage suit based on the breach of the union contract. The union was not required to rely on Bussell's financial responsibility as opposed to that of a life insurance company. Conversely, had Bussell in good faith secured an appropriate policy from a life insurance company, he would have complied with his duty under the union contract regardless of the financial ability of such company to pay the executrix in accordance with the policy terms. Bussell, under the contract, had no direct obligation to pay the . . . damages.

498 P.2d at 709 (footnote omitted). Such considerations are equally applicable to the present case. Alaskan General, like the employer in *Bussell*, agreed only to procure insurance, not to insure.[7]

■ We conclude that Alaskan General's contractual obligation to procure insurance was not a "hold harmless" or "indemnification" agreement resulting in policy coverage.

Chicago next argues that even were we to hold that the lease covenant is not a "liability assumed by contract" within the terms of the policy, the breach of contract damages nonetheless constitute "sums which the insured [became] legally obligated to pay as damages because of . . . bodily injury."

The term "legally obligated to pay as damages because of . . . bodily injury" refers to liability imposed by law for torts, and not to damages for breach of contract, except contracts for indemnity.[8] *Silva & Hill Construction Co. v. Employers Mutual*

*Liability Insurance Co.*, 19 Cal.App.3d 914, 97 Cal.Rptr. 498, 504 (1971); *Boiler Brick and Refractory Co. v. Maryland Casualty Co.*, 168 S.E.2d 100, 102 (Va.1969). *Long* states:

> The law imposes upon the insured a liability to pay damages *for bodily injuries* or damages to property *caused by his carelessness* and arising out of the ownership, maintenance, care, custody, or use of property. This is the liability upon which the insurer agrees "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay."

1 R. Long, supra § 1.10, at 1–25 (emphasis added). In *Silva* a contractor had promised to build and deliver in good condition a portion of a highway within a prescribed time. Owing to the dereliction of its employees, the contractor failed to perform the contract. The contractor had liability insurance similar to the present policy, which provided that the insurer would "pay on behalf of [the contractor] all sums which the [contractor] shall become legally obligated to pay as damages because of property damage. . . ." 97 Cal.Rptr. at 502. *Silva* held that the contractor's default "was simply a breach of . . . contract. . . . Coverage of such an eventuality was never contemplated by the [contractor's property damage liability policy]." *Id.* at 504.

In *Boiler Brick* a steam boiler supplier that had settled a warranty claim for the cost of replacing a defective boiler sought indemnification from its insurer. The court held that the supplier's liability arose primarily out of its contractual obligation and denied indemnification because the promise "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property" covered only tort liability, not damages resulting from

---

**7.** We note also that a loose construction of the lease covenant as an indemnification agreement would represent a major deviation from the most recent trend of our decisions. In *Alaska-Ins. Co. v. RCA Alaska Communications, Inc.*, there was an express hold harmless clause in the lease, yet this court held that even this failed "to clearly establish [the tenant's] liability for fire damage caused by its own

negligence." 623 P.2d 1216, 1219 (Alaska 1981) (footnote omitted).

**8.** An exception to this general rule may arise where the contract breach itself results in injury to persons or property. In this case the tenant's failure to insure Olympic bears no causal relation to the firefighter's death.

assumed or imposed contractual liability. 168 S.E.2d at 102.

As discussed previously, we construed a liability policy almost identical to the present policy in *Continental Insurance Co. v. Bussell*, 498 P.2d 706 (Alaska 1972). In *Bussell* an employer breached a union contract which required him to buy a $25,000.00 life insurance policy for the benefit of his employees. We held that the employer's policy, which included general and contractual bodily injury liability coverage, did not by its terms cover the breach of contract to procure insurance. "Neither of the coverage portions in issue applies to damages arising from an insured's breach of a contractual duty. There is no language in any section of the policy which even tangentially alludes to coverage protecting against breaches of contract." 498 P.2d at 710 (footnote omitted).

Chicago attempts to distinguish *Bussell* as a case in which the insured could not have reasonably expected to be covered by the insurance. Chicago insists that in this case the insured purchased the general liability insurance with the thought that it would satisfy the lease agreement to buy insurance. The only evidence Chicago offers to show Alaskan General's intent is the "Waiver of Subrogation" clause appended to the policy, which provides in part:

> It is agreed that the word "Insured" includes Alaskan General, Inc., Wholesale Division provided the named insured is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this policy, but only in respect of operations by or on behalf of the named insured or of facilities of the named insured or used by them.

Although the "Waiver of Subrogation" clause mentions contracts to procure insurance, it does not even remotely suggest that the policy insures such contracts. Instead, the clause merely conditions coverage of Alaskan General's wholesale division upon whether the retail division (the named insured) is required to buy insurance.

Thus, we hold that Providence's policy does not expressly cover Alaskan General's failure to procure insurance.[9]

## III. THE IMPLIED INSURED DOCTRINE

In *Alaska Insurance Co. v. RCA Alaska Communications, Inc.*, we held that absent a clear contractual provision to the contrary, a tenant is an implied coinsured under the landlord's fire insurance policy.

Therefore, we hold that if the landlord in a commercial lease covenants to maintain fire insurance on the leased premises, and the lease does not otherwise clearly establish the tenant's liability for fire loss caused by its own negligence, by reserving to the landlord's insurer the right to subrogate against the tenant, the tenant is, for the limited purpose of defeating the insurer's subrogation claim, an implied co-insured of its landlord.

> The company [Providence] will pay on behalf of the insured all sums which the insured, by reason of contractual liability assumed by him *under any written contract of the type designated in the schedule* for this insurance, shall become legally obligated to pay as damages because of
> bodily injury or property damage
> to which this insurance applies, caused by an occurrence .... [Emphasis added.]

The "schedule" referred to in the policy designates only one type of contract—"Purchase Order Agreements." Chicago's attempt to equate a lease and a purchase order agreement is not persuasive. In any event, the policy provision expressly limits coverage to contracts which "assume" liability, and as discussed previously, the lease covenant to procure insurance is not an assumption agreement.

---

**9.** Chicago advances two other theories to establish express coverage, neither of which has any merit.

First, Chicago submits that Olympic acted as a "real estate manager," and that coverage is therefore established under the omnibus clause in the general liability policy. That clause provides that persons or organizations acting as real estate manager for the named insured are covered by the policy. We reject this argument because Olympic's rights under the lease are not substantially different from the affirmative duties required of every lessor. *See Savoy v. Action Prods. Co.*, 324 So.2d 921, 924 (La. App.1975).

Alternatively, Chicago submits that coverage is established pursuant to the contractual liability policy. The relevant portion of that policy provides:

623 P.2d 1216, 1220 (Alaska 1981). Chicago notes that both *RCA* and the present case involve commercial lease transactions. Moreover, in both cases it can be argued that extending coverage furthered the "reasonable expectations" of the landlord and tenant. Chicago thus contends that we should extend the rule announced in *RCA* and hold that Olympic became an implied insured of Alaskan General when Alaskan General agreed to procure liability insurance covering Olympic but failed to do so.

Notwithstanding such factual similarities, we decline to characterize Olympic as an implied insured. The dispositive distinction between the present case and *RCA* is that in *RCA* the insurer seeking subrogation had contractually agreed to insure against loss due to fire. Indeed, the landlord in *RCA* had procured the fire insurance policy one year before the lease was executed. It is from that context which we assessed the reasonable expectations of the parties with respect to fire loss due to the tenant's negligence. In contrast, as we discussed at length in Section II of this opinion, Providence did not contractually agree to insure against risks attributable to Olympic. Presumably, the premiums charged by Providence reflected only the risks expressly set forth in the policy. We cannot say as a general rule that such premium rates would not vary were the landlord listed as a named insured.

In sum, we find no compelling policy considerations to transfer the risk of loss from an insurance carrier that has agreed to bear the loss to one that has not.

The judgment of the superior court is AFFIRMED.

MATTHEWS, Justice, with whom RABINOWITZ, Chief Justice, joins, dissenting.

The majority opinion observes:

Because "liability assumed by contract" refers to a particular type of contract—a hold harmless or indemnification agree-

ment—and not to the liability that results from breach of contract, the contractual liability exclusion applies only to hold harmless agreements.

I agree with this statement. What it necessarily means is that the contractual liability exclusion clause [1] has no application to this case. What we are therefore left with is the general coverage agreement which provides:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury . . .

caused by an occurrence. . . .

Alaska General agreed to buy liability insurance in the minimum amount of $300,-000.00 to protect Olympic from loss due to injuries on premises leased by Alaska General from Olympic. A fire occurred on those premises and a man was killed as a result. His personal representative has recovered some $600,000.00 from Olympic. For purposes of this case all parties are assuming that Alaska General is liable to Olympic for $300,000.00 of that $600,000.00. The question in this case is whether this obligation of Alaska General falls within the terms of the general coverage clause quoted above. Stated differently, the question is whether Alaska General's obligation to pay is "because of bodily injury." [2]

Insurance policies are construed to provide that coverage which a layman would reasonably expect, given a lay interpretation of the language of the policy. *United States Fire Insurance Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979); *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63, 65–66 (Alaska 1977). A lay person would naturally conclude that Alaska General's obligation to pay $300,000.00 has come about because of the death which occurred on its premises. He might conclude that there is another cause as well, that is, Alas-

---

1. The clause provides:

   This insurance does not apply: (a) to liability assumed by the insured under any contract or agreement except an incidental contract.

2. The policy expressly defines bodily injury to include death.

ka General's failure to procure liability insurance specifically naming Olympic as an insured. That, however, would simply mean that there is more than one cause for Alaska General's obligation, not that the obligation was not also caused by bodily injury. Reasonable laymen recognize, as does the law,[3] that there may be more than one cause which plays a substantial role in bringing about a result. Nothing in the policy states or implies that bodily injury must be the exclusive or sole cause of the obligation.

The reasonable layman's view that coverage is afforded is supported by a more legalistic interpretation of the policy. The coverage clause is standard. Tinker, Comprehensive General Liability Insurance—Perspective and Overview, 25 Federation of Insurance Counsel Quarterly 217, 300 (1975). It is generally interpreted to be broad enough to include cases where damages are imposed under contract as well as under tort theories. Thus, in discussing the contractual liability exclusion clause in conjunction with the coverage clause, Tinker states:

> That portion of the coverage grant is intentionally *broad enough to include the insured's obligation to pay damages for breach of contract as well as for tort*, within limitations imposed by other terms of the coverage agreement (e.g., bodily injury and property damage as defined, caused by an occurrence) and by the exclusions (e.g., this exclusion [assumed contractual liability] CCC, alienated premises, damage to products, etc.). In fact that part of the coverage grant would include the liability of others assumed by the insured under contract (hold harmless agreements).
>
> It is the latter to which this exclusion is addressed. Note that the exclusion does not run to duties assumed by contract, or to liability by reason of contract, but to "liability assumed" by the insured under a contract. The exclusion therefore does not remove coverage simply because a claim is based on contract and not in tort.

*Id.* at 265 (emphasis added). Similarly, Long states:

> The significant words of the bodily injury insuring agreement are "legally obligated to pay as damages." This language is broad in scope and includes liability assumed by contract unless such liability is specifically excluded.

2 Long, The Law of Liability Insurance § 10.17, at 10–26 (1981). Indeed, the very existence of the contractual exclusion clause implies that without it liability would exist under the terms of the coverage clause for a contract claim the underlying source of which is bodily injury.

For these reasons I would construe Providence Washington's policy to provide coverage for Alaska General's obligation to pay a portion of the damages resulting from the firefighter's death.

---

**3.** *See State v. Abbott*, 498 P.2d 712, 726–28 (Alaska 1972).